

CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
CARL.WESCOTT@CAPITALIDE.AS
+1 276 773 7377

# UNITED STATES DISTRICT COURT

## DISTRICT OF CALIFORNIA

### CENTRAL DIVISION

2:22-CV-C8029-WLH-KS

| | |
|---|---|
| CARL A. WESCOTT, | Civil Action No. _____ |
| Plaintiff, | AMENDED **PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; BREACH OF FIDUCIARY DUTY; and NEGLIGENCE;** |
| vs. | |
| MR. JAY CAPLAN; LJ CAPITAL, LLC; LJ CAPITAL PARTNERS, LLC; LJ CAPITAL PARTNERS II, LLC | **JURY TRIAL REQUESTED** |
| Defendants. | |
| + DOES 1 through 25 | |

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants Mr. Jay Caplan, LJ Capital, LLC; LJ Capital Partners, LLC; and LJ Capital Partners II, LLC. In support of his legal complaint, the Plaintiff alleges as follows:

**The Parties: Plaintiff and Defendants**

1. The Plaintiff is an individual presently residing in Scottsdale, Arizona.

2. Defendant Mr. Jay Caplan is a long-time resident of Santa Barbara, California.

1

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY;**

3. LJ Capital, LLC ("LJ Capital"), LJ Capital Partners, LLC ("LJ Capital Partners"), and LJ Capital

Partners II, LLC ("LJ Capital Partners II") were and are LLC shells that attempted to give Jay

Caplan and his wife Andrea the veneer of respectability.

4. However, two of the three LLCs (so far) did not have their basic filings and payments made, and

thus have been suspended, thus failing in their mission.

**Further allegations regarding conspiracy between defendants**

5. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,

Mr. Jay Caplan, as an individual, in addition to acting for himself and on his own behalf

individually and for the benefit of his marital community, was acting as the agent, servant,

employee, and/or representative of, and with the knowledge, consent, and permission of, and in

conspiracy with, each and all of the other Defendants (individual and entities) and within the

course, scope, and authority of that agency, service, employment, representation, and

conspiracy.

6. Plaintiff further alleges on information and belief that the acts of each of the Defendants were

fully ratified by each and all the other Defendants.

7. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious

actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of

the specific Defendants were approved, ratified, and/or done with the cooperation and

knowledge of each and in conspiracy with all other Defendants (individual and corporate).

8. In addition, upon information and belief, there other nefarious corporate, trust, and other entity

type Defendants beyond LJ Capital, LJ Capital Partners, LLC and LJ Capital Partner II, LLC

2

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

involved in these conspiracies, currently unknown to Plaintiff.  They shall emerge with the benefit of legal discovery.

9. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to the named entity Defendants, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

10. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all the Defendants.

11. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Jurisdiction and Venue**

12. Mr. Caplan is a resident of Santa Barbara, California.

13. LJ Capital is a citizen of this district as well, domiciled at Mr. Caplan's house in Santa Barbara, California.

14. LJ Capital Partners, LLC is an LLC which also is run out of Mr. Caplan's house in Santa Barbara.

3

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

15. This is an action for damages pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and a claim for damages greater than US $75,000.  The alleged damages are explained in further detail below as they are critical to this Court establishing subject-matter jurisdiction.

16. Supplemental jurisdiction over the Plaintiff's state law claims is pursuant to 28 U.S.C. § 1367.

17. With Mr. Caplan and LJ Capital being domiciled in this district, and LJ Capital Partners, LLC utilizing the Caplan home as its U.S. office and mailing address, this venue is appropriate, and this Court can assert jurisdiction over these Defendants.

**Subject-Matter Jurisdiction – Legal Standards**

18. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff qualifies for United States District Court under 28 U.S. Code § 1332(a)(1):

> DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS
>
> **(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> **(1)** citizens of different States;   *(28 U.S. Code § 1332 (a)(1))*

19. The Plaintiff resides in Scottsdale, Arizona (Maricopa County).

20. As Mr. Caplan lives in Santa Barbara, this court is an appropriate venue, and this Court can assert general personal jurisdiction over the individual defendants.

21. The entity Defendants are citizens of this district and/or *de facto* citizens of this district.

22. Thus, with the Plaintiff in Maricopa County and the Defendants in Santa Barbara County, the parties have complete diversity of citizenship.

4

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;
PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

23. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs (*28 U.S.C. § 1332(a) (2014)*).

24. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law. 14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed. 2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

25. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at 352-353.

26. Numerous courts, including the United States Supreme Court have held that the amount in controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit. FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

27. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather than an assessment of liability. *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

28. The amount in controversy is determined without considering accrued or accruing interest or the costs associated with the lawsuit. (*28 U.S.C. § 1332(b)*)

29. Courts have held that collateral effects will not be taken into account when calculating the amount in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934)

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is involved, even though their decision turns on the same question of law."). See also *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our jurisdiction depends upon the amount in controversy, it is determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

30. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

31. Besides the US $70,000 that Mr. Caplan owes the Plaintiff (~$27,000 with 10% annual pre-judgment interest), the Pollock transaction alone not closing has cost the Plaintiff over US $295,500 (or $591,000 had Mr. Caplan closed the entire promised US $10 million in secured debt for Mr. Pollock's necessary construction)

32. Therefore, the Plaintiff asserts that this case qualifies for this federal United States District Court under complete diversity of citizenship *(28 U.S. Code § 1332 (a)(1))*

**Background Facts:  the original ~$27,000 advanced to Mr. Caplan**

33. In approximately 2012, the Plaintiff needed to borrow money against real property in the form of mortgages and lines of credit.

6

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

34. The Plaintiff engaged Jay Caplan of LJ Capital Partners to assist as a mortgage broker and investment banker to source debt.

35. The fee arrangement with Mr. Caplan was that Mr. Caplan or his company would receive 1.5% of the debt he raised for the Plaintiff. So, if Mr. Caplan sourced, for example, a $1 million mortgage for the Plaintiff, Mr. Caplan would be paid US $15,000 at the close.

36. The Plaintiff advanced approximately $27,000 to Mr. Caplan and his entity LJ Capital, LLC in monthly payments as an advance to be credited against the fees Mr. Caplan would receive for successful placements of debt.

37. Mr. Caplan assured the Plaintiff that he and his company would perform and arrange one or more successful debt placements in favor of the Plaintiff.

38. Mr. Caplan almost performed for the Plaintiff, arranging a US $3 million unsecured line of credit with American Riviera Bank for which the Plaintiff was qualified.

39. The Plaintiff met underwriting guidelines and met with bank representatives.

40. However, before that transaction could close, American Riviera Bank discontinued its unsecured line of credit product.

**Then, a series of rollovers and lulling promises, but no closings**

41. After the American Riviera transaction failed, rather than refund the Plaintiff's advances, Mr. Caplan promised that he and LJ Capital would raise other money for the Plaintiff.

42. Thus began a series of failed transactions in which, in each case, Mr. Caplan agreed to roll over the $27,000 credit and perform by closing a deal resulting in cash for the Plaintiff, only to fail and fail again:

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

- In 2012, Mr. Caplan promised to fund the Plaintiff's purchase of a coffee farm and factory in Honduras.

- In 2014, Mr. Caplan promised to fund fund the Plaintiff's (with partner Roger Pollock) acquisition and development of a 47-hectare parcel on Cerritos Beach in Mexico.

- In 2015, Mr. Caplan promised to fund the Plaintiff's purchase of Montecristo, a distressed development in Nicaragua.

- After that, after the Plaintiff had acquired Montecristo without funding from Mr. Caplan, Mr. Caplan promised to refinance Montecristo so that the Plaintiff had the capital to retain Montecristo.

- In 2018, Mr. Caplan promised to fund the Plaintiff's acquisition of Seaside Mariana, a failed/distressed development in Nicaragua.

**The Penultimate Promised Closing: providing a Line of Credit to Mr. Randy Russ**

43. After the those promised closings did not materialize, in 2020, Mr. Caplan agreed to apply the Plaintiff's credited advance to help Mr. Randy Russ, a Texan resident who had agreed to purchase three properties from the Plaintiff's former company.

44. Mr. Russ owned and owns a construction company, Bobby Castle Construction that builds retail facilities for A-credit national retailers such as Michael's Craft Stores (250+ stores built in 20+ states) and Cost Plus World Market (200+ stores built).

45. Bobby Castle Construction often has had between 100 and 200 contractors out at various job sites around the United States, and traditionally has thrown off quite a bit of cash.

8
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

46. Mr. Russ, Mr. Caplan and the Plaintiff agreed that Mr. Caplan would obtain/provide a line of credit for Mr. Russ and/or Bobby Castle Construction.

47. Mr. Russ and his company had purchased those three properties, and the Plaintiff had signed them over and transferred control of the properties via a power of attorney to Mr. Russ' company and Mr. Russ' business partner.

48. However, Mr. Russ has been unable to pay the amounts owing to the Plaintiff and owes significant sums on his purchase.

49. The notion was that Mr. Caplan would use the line of credit to make one or more payments on the purchased properties.

50. Mr. Caplan stated that he could and would get that financing done, estimating based on information provided that he could likely arrange at least a US $1 million or US $2 million line of credit for Mr. Russ and/or for Mr. Russ' company, Bobby Castle Construction.

51. Mr. Caplan said he would provide that financing and subtract the monies the Plaintiff advanced to him from the fees that Mr. Caplan would charge to Mr. Russ.

52. The Plaintiff accepted Mr. Caplan's offer, forming an oral contract.

53. Since Mr. Russ would then be able to make payments owing the Plaintiff for properties the Plaintiff had signed over to Mr. Russ and his business partner, the Plaintiff wasn't even concerned about Mr. Russ reimbursing the Plaintiff for the $27,000 or so Mr. Caplan would subtract from his fees to Mr. Russ.

54. However, ultimately, Mr. Caplan was unable to provide the line of credit for Mr. Russ and his company.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

55. (Mr. Caplan claims that Mr. Russ did not provide all the information that Mr. Caplan needed. These will be issues of fact for the jury trial).

**The Most Recent Promised Closing: providing financing for Cerritos Village**

56. Mr. Caplan failed to provide the promised closings and investment monies for the Seaside Mariana purchase (costing the Plaintiff over $300,000 he would have made on the transaction) and Mr. Russ' line of credit.

57. In November 2021, Mr. Caplan subsequently re-affirmed his debt and the obligation to close a transaction for the Plaintiff.

58. At that time, the Plaintiff inquired as to whether Mr. Caplan could source the debt that the Plaintiff needed to close a deal for his client, Mr. Pollock.

59. Specifically, the Plaintiff was raising money for Mr. Pollock's Cerritos Village residential subdivision, in which Mr. Pollock planned to build 49 villas on Cerritos Beach in Baja California Sur.

60. (The Plaintiff later further documented that deal for Mr. Caplan in a December 2nd email and letter to Mr. Caplan).

61. Mr. Caplan stated that he could and would get that financing done for the US $10 million of capital that Mr. Pollock's company needed for that development.

62. Mr. Caplan said he would provide that financing, and as he had for many other deals, subtract the monies the Plaintiff advanced to him from the fees that Mr. Caplan would charge.

63. The Plaintiff accepted Mr. Caplan's offer, forming an oral contract.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

64. More specifically, Mr. Caplan promised to provide either a mortgage on Mr. Pollock's company's property for US $5 million, or a revolving line of credit ("LOC") on said property (secured debt).

65. In either case, once Mr. Pollock paid off the first US $5 million mortgage or the LOC, Mr. Pollock would have the opportunity to borrow another US $5 million, for a total of US $10 million.

66. Under the terms of the Plaintiff's contract with Mr. Pollock, the Plaintiff would have received US $300,000 from Mr. Pollock's company at the close of the first US $5 million construction loan.

**Concurrent Discussions about Mr. Caplan's debt to the Plaintiff**

67. In November 2021, after about a decade of Mr. Caplan failing to deliver on each promised close (each an independent contract to perform formed with the Plaintiff, each of which Mr. Caplan breached), the Plaintiff decided that he should at least get his advanced consideration (~$27,000) back.

68. The Plaintiff confirmed Mr. Caplan's debt with him and asked for the records and the exact amount.

69. Mr. Caplan could not provide the exact amount owing, but Mr. Caplan orally confirmed the Plaintiff's memory, and the rough amount advanced in approximately 2012 ($27,000 or $28,000 or so).

70. The Plaintiff will use $27,500 as the middle point between those two numbers for the best approximation of Mr. Caplan's debt.

11

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

71. Mr. Caplan re-affirmed his debt to the Plaintiff.

72. Mr. Caplan lives in relative luxury in a home that he owns in Santa Barbara.

73. Mr. Caplan had just told the Plaintiff how Mr. Caplan had vacationed for a week in Belize, spending $8,000 to rent another luxury house for that week's vacation.

74. The Plaintiff, on the other hand, has not had much earned income for the past four years, totaling under $10,000 of earned income in 2019, 2020, 2021, and 2022 thus far.

75. To the Plaintiff, it made no sense that a rich individual who failed to perform over and over and over was still holding his monies.

76. In November 2021 and December 2021, after confirming the approximately $27,500 owing by Mr. Caplan as of 2012, the Plaintiff requested that Mr. Caplan return his monies.

77. Mr. Caplan confirmed that the Plaintiff had advanced monies to him and not received the services promised to the Plaintiff.

78. Mr. Caplan confirmed that he owed services that had not been provided.

79. However, Mr. Caplan refused to return the Plaintiff's money.

80. In December 2021, the Plaintiff threatened to sue Mr. Caplan if Mr. Caplan would not return his money.

81. Rather than repaying the Plaintiff his monies, Mr. Caplan stated he was not going to complete the projects he had committed to closing for the Plaintiff and his clients.

82. From the Plaintiff's viewpoint, as California allows for 10% annual pre-judment interest, Mr. Caplan now owes him over US $70,000.

83. Further, in breaching the oral contracts formed with the Plaintiff, for example, to close Mr. Pollock's US $10 million financing, Mr. Caplan cost the Plaintiff much larger sums.

12

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

84. On the Pollock project alone, Mr. Caplan has cost the Plaintiff hundreds of thousands of dollars.

85. Of course, the Plaintiff is doing what he can to mitigate risk and close that deal for Mr. Pollock.

86. However, the inflationary spiral the world began this year, rising interest rates (having recently doubled), along with the impending recession, among other factors, have effectively ended the Plaintiff's hopes and chances of closing that deal for Mr. Pollock.

87. The precise amounts that Mr. Caplan has cost the Plaintiff in his multiple breaches of contract and his repudiations are fact-based matters to be determined at jury trial.

**Righting the Scales of Justice via Jury Trial**

88. The Plaintiff, unfortunately, has been left with no choice but to file this legal complaint in hopes that justice can be served.

89. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

90. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

**Count I – Breach of Contract**

91. The Plaintiff realleges paragraphs 1-90 as if fully set out herein.

13

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

92. The Plaintiff entered into valid, binding contracts with Mr. Caplan (as agent for his LJ Capital entities).

93. The Plaintiff fully performed, having provided monies to Mr. Caplan, and providing the information that Mr. Caplan stated he needed on the multiple contracts formed.

94. The most recent promises to pay (with services) were in 2020, November 2021, and December 2021, just before Mr. Caplan's repudiation of two contracts formed with the Plaintiff.

95. The oral contracts are documented in writing, and the Plaintiff is testifying as to them under penalty of perjury via this verified complaint.

96. Conjunctively and alternatively, to the extent that there are any technical deficiencies in any contracts, the Plaintiff asks this Court to apply a quasi-contract, using the principal of quantum meruit, in the interests of equitable justice.

97. All allegations and specific consequential damages to be fully proven at jury trial.


**Count II – Promissory Estoppel**


98. The Plaintiff realleges paragraphs 1-90 as if fully set out herein.

99. Mr. Caplan, as agent for his LJ Capital entities, promised to close multiple transactions for the Plaintiff, most recently the Seaside Mariana, Cerritos Villages, and Russ/Bobby Castle Construction financings (the "Original Promises").

100.   The Plaintiff relied on the Original Promise to his detriment.

101.   For example, it is now too late to close the Seaside Mariana transaction, as the original closing date was to be in late 2018.

14
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT;**
**PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

102. Similarly, for the Pollock transaction, the market has now changed, and it's no longer realistically feasible to close that transaction.

103. As the Plaintiff cannot go back in time, he has been permanently deprived of the revenue associated with transactions like Seaside Mariana, with the Plaintiff's reliance upon Mr. Caplan's Original Promises.

104. All allegations and the full extent of the damages to be fully proven at jury trial.

### Count III – Breach of Fiduciary Duty (Caplan)

105. The Plaintiff realleges paragraphs 1-90 as if fully set out herein.

106. As Mr. Caplan signed the Plaintiff up as a client and promised to raise money for him, Mr. Caplan owed the Plaintiff duties of good faith, fair dealing, honest performance, and strict accountability.

107. In repeatedly promising to close financings and transactions and failing to do so, Mr. Caplan breached his fiduciary duty to the Plaintiff.

108. Mr. Caplan's breaching his fiduciary duty was the proximate cause of multiple categories of damages and financial harm to the Plaintiff.

109. All allegations and the precise amount of damages shall be fully proven at jury trial.

### Count IV – Negligence (Caplan)

110. The Plaintiff realleges paragraphs 1-90 as if fully set out herein.

15
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

111. As Mr. Caplan signed the client up as a client and promised to raise money for him, Mr. Caplan owed the Plaintiff duties of good faith, fair dealing, honest performance, and strict accountability.

112. In repeatedly promising to close financings and transactions and failing to do so, Mr. Caplan breached his fiduciary duty to the Plaintiff.

113. Mr. Caplan's breaching his fiduciary duty was the proximate cause of multiple categories of damages and financial harm to the Plaintiff.

114. All allegations and the precise amount of damages shall be fully proven at jury trial.

WHEREFORE, PLAINTIFF PRAYS:

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breaches of contract and repudiations of contracts;

(b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' promissory estoppel;

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of Mr. Caplan's breaches of fiduciary duty along with the imposition of exemplary damages to deter Mr. Caplan from shirking his fiduciary duties in the future;

(d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a proximate result of Mr. Caplan's negligence along with the imposition of exemplary damages to deter Mr. Caplan from shirking his duties and committing acts and non-acts of negligence in the future;

PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY

(e) For reasonable compensation for the value of his time in representing himself while he cannot afford an attorney (*quantum meruit*);

(f) For reasonable future attorney's and paralegal fees and costs including administrative, filing, service, Court reporters, jury fees, travel costs and for all other reasonable costs of this action;

(g) For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED

Carl A. Wescott, *pro se*   11/29/2023

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

1

## VERIFICATION

2

3

4

5

I, Carl A. Wescott, under penalties for perjury provided by law pursuant to California state law, as well as the federal laws of the United States of America, certify that the facts set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

6

7

_____

Carl A. Wescott

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY ESTOPPEL; NEGLIGENCE; BREACH OF FIDUCIARY DUTY**

November 25th, 2021



Mr. Jay Wesley Caplan
LJ Capital Partners
3077 Calle Mariposa
Santa Barbara, CA 93105

Dear Mr. Caplan:

The purpose of this communication is to request repayment of a ~$26,500 fee advance ("the Advance") remitted to your company in approximately 2012. I can't remember the exact date nor the exact amount, but I believe I paid three full months of $7500 per month and 1 partial month of $4k or so, so my best guess is $26,500.

I'm just requesting the principal of what I sent you, assuming I can get $7500 in November and so on as requested/suggested below. Would you be so kind as to look in your records and provide the amount paid?

When you have time and interest in deals we can close, I'd still like to work with you to close one or more. You'll earn way more than the $26.5k or whatever it is.

As you know, the Advance was originally intended to apply toward LJ Capital's fee toward a contemporaneous fund raise. While I've never felt, on projects you've taken on, that you haven't wanted to work with me attempting to get to a close, you may be too busy to take on the Cerritos project or any of the others I am currently working on in Mexico, Greece, Belize, or Nigeria.

As you know, the original fund raise was unsuccessful, and none of the subsequent ones have gotten to a close, and thus the fee was never earned.

I have repeatedly engaged LJ Capital's services over the years with the express understanding that I had a credit toward your contingent fee (whatever the amount is). We've never closed on debt or equity capital through your efforts, and thus, no contingent fee has ever been earned, thus the credit has not been earned.

1

Within the last year, you kindly even agreed to apply my credit toward securing a business LOC for Randy Russ, if you could close one for him, which I appreciated. I'm sorry he didn't get you what you needed. I still hope we'll close a deal some day, and in fact I'm confident we will if you have the time in the future.

Man, I remember way back when, you almost got me a $3 million personal unsecured line of credit... crazy that that product still existed post-9/2008.

As per our prior conversation on this a little while back, where you reaffirmed my credit and your debt to me, I have a right to a refund of my unearned advance.

Though strictly legally, I would have the right to 10% compounded interest on my money (as per California law, including for Account Stated under CACI 373), I just want my money back, thank you, assuming I can get it all back over the next 3 or 4 months.

If and when you have time to work on my deals, I still want to hire you and LJ Capital Partners to work on my transactions... all of a sudden I have a bunch of them, and I suspect you'll like at least a couple of them. I'll still pay you at the close, but maybe you can just get paid out of escrow on future deals, right at and through the close?

My suggestion is, can you get me my money back at the same pace that I paid it to you? Can you please send me $7500 next week in late November, $7500 in late December, and so on until we're square?

I can provide wiring information, or Paypal, and I can register for Zelle if that helps.

Please call me if you want to talk through this, thanks.

Carl A. Wescott
8210 E. via de la Escuela
Scottsdale, AZ 85258
+1 936 937 2688
Carlwescott2020@gmail.com

December 13th, 2021



Mr. Jay Wesley Caplan
LJ Capital Partners
3077 Calle Mariposa
Santa Barbara, CA 93105

Dear Mr. Caplan:

The purpose of this communication is to demand repayment of a ~$27,000 fee advance ("the Advance") remitted to your company in approximately 2012, plus interest. Thank you for confirming the approximate amount.

As I recall, I paid three months of the $7500 fee (advanced towards the fees for a successful close, in this case at 1.5 points on debt) when you were too busy to help me, and nothing happened with getting me capital, "LJ" or otherwise. When I complained about this you said you would hire someone to help with other files. The following month, my file was assigned to your new employee, who had never gotten a loan before, was not a mortgage broker, and did not have securities registrations.

Let's separate out the issue of money you owe me (paid for a service I never received, that you keep rolling forward, re-affirming that I have a credit with you) from monies that a court of law will award me for breaching the various contracts formed with me, harming me to the tune of millions of dollars.

This letter will address the former issue; I may send you a second one, or I might just go straight to lawsuit tomorrow.

I plan to file a legal complaint against you and your LLC tomorrow, but open to solving one or the other issues I have today.

<u>Money you and LJ Capital owe me for the $27K I advanced to you in 2012</u>

There are causes of action in California for an Account Stated, and also for Money Had and Received. According to CACI 373, the elements of the Account Stated cause of action are:

1

1. LJ Capital owed me money from a previous transaction;
2. That LJ Capital by words of conduct acknowledged that the stated amount was owed;
3. That LJ Capital by words or conduct promised to pay the stated amount owed (in this case, possibly, by providing services that I'm not getting)
4. That LJ Capital has not in fact paid the stated amount;

I think all the elements are satisfied. You and LJ Capital have repeatedly agreed to roll the ~$27,000 credit into transactions (new contracts in each case) in which it has repeatedly failed to raise funds. LJ Capital is clearly no longer interested in earning the credit, and likely never was.  As a result, the amount should be repaid with interest. (See CACI 3935 on prejudgment interest). At the prejudgment interest rate of 10% the amount due would be almost $68,000.

[for settlement only]

For today only, before I file a lawsuit tomorrow, I'm willing to split the $27k principal and the amount owed down the middle and settle for $48.5k, which you can even pay in a few payments we can negotiate, with at least $7500 down tomorrow.

Please note that I'm not offering to settle your breaches of contract, negligence, breach of fiduciary duty, promissory fraud, common law fraud, consumer fraud, promissory estoppel, your negligent representations, nor various types of interference with contracts and my prospective business advantage.  I simply want my money back and part of the interest owed, which will also narrow our issues, save you on attorney fees, and most importantly, reduce your consequential damages.

Frankly, you'll also look like less of an asshole to a future jury that is going to HATE you and want to punish you... the guy who steals from the poor and then goes on luxury vacations to Belize, spending eight grand on the house he stays in for a week.

Carl A. Wescott
8210 E. via de la Escuela, Scottsdale, AZ 85258
+1 936 937 2688 / Carlwescott2020@gmail.com

2



PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

Retail

U.S. POSTAGE PAID
PM
SCOTTSDALE, AZ 85258
NOV 30, 2023

90012

$9.65

RDC 03    0 Lb 14.90 Oz    R2305M148818-52

UNITED STATES
POSTAL SERVICE ® | PRIORITY® MAIL

- Expected delivery date specified for dome
- Domestic shipments include $100 of insu
- USPS Tracking® service included for d                ational destinations.
- Limited international insurance.**
- When used internationally, a custom                 quired.

*Insurance does not cover certain items. For d
Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe

FLAT RATE EN
ONE RATE ■ ANY WEIGHT

EXPECTED DELIVERY DAY: 12/02/23
USPS TRACKING® #
9505 5157 7471 3334 8400 77

TRACKED ■ INSURED

PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

FROM:
CARL WESCOTT
8210 E. Via de
la escuela
Scottsdale AZ 8

TO:
Clerk of Court
USDC
350 W 1st str
Suite 4311
Los Angeles, CA
90012-456

RECEIVED
CLERK, U.S. DISTRICT COURT
DEC - 4 2023
CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY



**UNITED STATES POSTAL SERVICE**®

**PRIORITY**® **MAIL**

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

## TRACKED ■ INSURED



PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

**VISIT US AT USPS.C**
ORDER FREE SUPPLIES O

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.